**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Rachelle Bailey,

      Plaintiff,

            Civ. No. 04-1399 (RHK/JSM)
            **MEMORANDUM OPINION
            AND ORDER**

v.

Seagate Technology LLC,

      Defendant.

---

Tammy P. Friederichs and Stephen M. Thompson, Friederichs & Thompson, PA, Bloomington, Minnesota, for Plaintiff.

James F. Baldwin and Terese A. West, Moss & Barnett, PA, Minneapolis, Minnesota, for Defendant.

---

**Introduction**

  This is an employment discrimination case. Plaintiff Rachelle Bailey has sued her former employer, Defendant Seagate Technology LLC, alleging gender discrimination and reprisal discrimination in violation of the Minnesota Human Rights Act. Before the Court is Seagate's Motion for Summary Judgment. For the reasons set forth below, the Court will grant Seagate's Motion and will dismiss Bailey's Complaint.

## Background

**A.     Bailey's Responsibilities and Co-Workers**

In June 2000, Bailey began working at Seagate as a senior legal secretary in Seagate's newly created intellectual property department ("IP Department").[1] (See Bailey Dep. Tr. at 53.) Her initial role was to set up the docket area and file documents. (See id. at 54.) When she was hired, the IP Department consisted of Bailey, patent agent Peggy Watson, and patent attorney/department director Leland Shultz. (See id. at 53-54.) In February 2001, Watson left Seagate leaving Bailey with "an abundance of work." (Id. at 84-85.) In July 2001, patent attorney Paul Dietz was hired to support Shultz, but Shultz resigned on Dietz's second day of work. (Dietz Dep. Tr. at 10.) Dietz then acted as director of the IP Department, but was not given that title until February 2002. (Id. at 11-12.)

From mid-2001 through 2002, the IP Department underwent significant growth and began to prosecute patents in-house. (See Bailey Dep. Tr. at 84-85; Bailey Aff. ¶ 3.) Beginning in October 2001, Dietz kept track of the errors allegedly made by Bailey and the situations where Bailey was not following his directions. (See Dietz Aff. Ex. A, B, C.) Bailey testified that it was impossible to be "error-free" with all the work she was performing. (Bailey Dep. Tr. at 93.) Because of the heavy workload and the "considerable amount of overtime" she was putting in, she asked Dietz for help to cover

---

[1] Bailey had previously worked for Seagate and its predecessor from 1988 to 1995. (See Bailey Dep. Tr. at 20-29.)

the extra work.  (See Bailey Dep. Tr. at 84-85.)  In September 2001, Dietz hired Anne Johnson to help alleviate some of Bailey's duties.  (See id. at 87; Bailey Aff. ¶ 3.)  In November 2001, Dietz hired patent attorney Brendan Hanley.  (See Dietz Dep. Tr. at 16-17.)  In February 2002, Dietz hired Jackie Stadt as a legal secretary.  (Id. at 17; Bailey Aff. ¶ 3.)  Since both Stadt and Johnson were new to the department, Bailey claims that she (and others) had to train them.  (See Bailey Aff. ¶ 3.)

As the workload continued to increase, Bailey again talked to Dietz about the need for additional employees.  (See Bailey Dep. Tr. at 93.)  Bailey also explained to Dietz that errors were more likely to occur if the workload problems remained unaddressed and the new secretaries needed to be trained.  (See Bailey Aff. ¶ 4.)  Rather than addressing those problems, Bailey felt that Dietz blamed her for errors in a "demeaning and unfair way." (See id.)  Bailey contends that Dietz would not have treated a male the same way.  (Bailey Dep. Tr. at 107.)  While not denying her mistakes, Bailey believed that "the errors could be attributable to excessive workload problems and the new employees."  (See Bailey Aff. ¶ 4.)  In early 2002, Bailey felt that her relationship with Dietz began to deteriorate.  (See Bailey Dep. Tr. at 81.)

### B.   Bailey Expresses Her Concerns

There is ample conflict regarding when Bailey complained and what she complained about.  Viewing the evidence supported in the record in a light most favorable to Bailey, the following appears to have occurred.  In February or March 2002, Bailey complained on one occasion about "the stressful environment" to human resources

representative Ester Williams. (See Bailey Dep. Tr. at 97, 102.) In March or April 2002, she twice complained to human resources representative Vicki Boyer.[2] (See id.) Bailey told Boyer that she felt Dietz was "demeaning, and I felt that he was harassing me, because I was a strong-minded woman." (Id. at 98.) The phrase "strong-minded woman" occurs frequently in this litigation. These are Bailey's words, not Dietz's. Boyer asked Bailey if she would like to file a formal complaint, but Bailey refused stating, "no, because once I start this process, we both know that either [Dietz] or myself was going to be gone, and it's not going to be him." (Id.)

In May 2002, Bailey told human resources representative Debra Reutiman that Dietz was "being unfair," "unfairly criticizing [her] for errors that weren't necessarily [hers]," harassing her because she was a "strong-minded woman," and favoring Stadt.[3] (See id. at 101, 107.) Bailey again refused to file a formal complaint, reiterating her fear of retaliation.[4] (See id. at 103.) After she made her complaints, Bailey claims that "[t]he office environment was just, to me, out of control. . . . It was extremely stressful . . . Dietz, his criticism, harassment was out of control." (Id. at 70.) Also in May 2002, Bailey told Dietz that he was treating her unfairly because she was a "strong-minded

---

[2] Boyer testified that she first talked with Bailey about Dietz in late July 2002. (See Boyer Dep. Tr. at 8-11.)

[3] Reutiman testified that Bailey complained to her in August 2002 about Dietz taking away some of her responsibilities, Dietz's unreasonable expectations, and her unhappiness about a low pay raise. (See Reutiman Dep. Tr. at 45-46.)

[4] Bailey testified that both Boyer and Reutiman "may have said [no retaliation] is the policy." (Bailey Dep. Tr. at 106-07.)

woman." (Bailey Dep. Tr. at 95.)

In early June 2002, Dietz presented Bailey with her annual performance appraisal. (See Dietz Dep. Tr. at 20-24.) Bailey's overall rating was "exceeds requirements," but she was rated as "nearly meets requirements" in work quality and work organization and planning. (See Bailey Dep. Tr. Ex. 2.) When Bailey requested a bonus in addition to her raise, Dietz refused and told her that she did not deserve a bonus or her title, and that she had misrepresented herself. (See id. at 119.) Bailey felt completely "devalued" by his comments.[5] (Bailey Aff. ¶ 5.) She told Dietz that he was treating her "unfairly and inappropriately," (id. ¶ 5), and that she "was going to be going to HR"[6] (Bailey Dep. Tr. at 123).

Between June and September 2002, Dietz decided he did not want Bailey on his team because of her poor work performance. (See Dietz Dep. Tr. at 79-80.) He explained:

> As a specific example, I discussed . . . the international pen application, where the application that was mailed did not include all of the papers that needed to be submitted. Ms. Bailey handled the mailing of that application and the photocopying of that application. The application was complete when I reviewed it but the documents that were mailed included a few pages that were missing.

---

[5] Seagate points out that Bailey uses the word "devalued" only in her Affidavit, not in her deposition. (Reply Mem. at 3 n.3.)

[6] Bailey asserts in her memorandum that she complained to Reutiman "shortly" after this exchange with Dietz in June 2002. (Mem. in Opp'n at 5.) She cites the deposition testimony of Reutiman in support, but Reutiman testified that Bailey complained to her on October 3, 2002. (Reutiman Dep. Tr. at 44.)

> Another example that formed my basis or recommendation was I had asked her to review the docket for any deadlines coming due while I was on a business trip overseas, I asked her that several times and was assured each time I asked that there were no deadlines coming due while I was gone yet when I came back from that business trip I was informed that we missed a deadline. If I was in private practice that could subject me to malpractice claims. . . .
>
> [And] [u]nder the rules of professional responsibility I'm responsible for the work of people that are performing work for me and I wasn't confident with the work she was performing.

(Id. at 80-81.) He conveyed his decision to his manager, Joe Villella, who recommended he work with human resources to "come to an agreement on how to approach the matter." (Id. at 82.)

Sometime in late June or July 2002,[7] Reutiman set up a meeting between Reutiman, Bailey, and Dietz. (Bailey Dep. Tr. at 119.) At the meeting, Bailey stated that Dietz was treating her "unfairly," like the "black sheep of the department," and like she "didn't exist." (Id. at 120.) She claims that she also said that Dietz was "treating me unfairly, harassing, demeaning and devaluing me because I was a strong-minded woman."[8] (Bailey Aff. ¶ 7.) She asserts that Dietz brought up her performance problems and said that her "performance was that of a basic legal secretary and that [she had]

---

[7] The parties dispute when this meeting occurred. Seagate contends that it was on August 8, 2002. (Mem. in Supp. at 10; see Reutiman Dep. Tr. at 65.) Bailey contends in her memorandum that it was in May 2002 (Mem. in Opp'n at 5), but testified that the meeting was in the "late June/July time frame. Maybe later" (Bailey Dep. Tr. at 119).

[8] Seagate contests this statement from Bailey's Affidavit, noting that Bailey does not testify to this in her deposition. (Reply Mem. at 3.)

misrepresented [herself]" as a senior legal secretary.  (Bailey Dep. Tr. at 122.)  At the end of the meeting, Dietz and Bailey agreed to "try to act more civil towards each other," which Bailey felt was a satisfactory outcome at the time.  (Id. at 123-24.)  Dietz testified that he knew Bailey had alleged harassment against him sometime after mid-July.  (Dietz Dep. Tr. at 87-88.)

After that meeting, Dietz continued to criticize Bailey over "very small items and sometimes two, three, four, five different times a day."  (Bailey Dep. Tr. at 124.)  Meanwhile, Dietz and Reutiman continued to discuss Bailey's performance, Dietz's responsibility to help improve her performance, and Dietz's feeling that her work was not improving.  (See Reutiman Dep. Tr. at 69-71.)

On August 1, 2002, Dietz, Reutiman, and Marybeth Carnicom, another human resources representative, discussed Bailey's performance and decided that Dietz should have regular meetings with Bailey to help her improve.  (See id. at 60-64.)  On August 6, 2002, Dietz again met with Reutiman and they decided Dietz would issue Bailey a verbal warning regarding her deficient performance.  (Id. at 64-65.)  On August 7, 2002, Bailey came to see Reutiman to discuss her job responsibilities, her raise, and Dietz's "unrealistic expectations."  (See Reutiman Dep. Tr. at 82.)

At the end of September 2002, Dietz and Reutiman decided to issue Bailey a written warning, a performance improvement plan ("PIP"), and a new performance appraisal to update her June performance appraisal.  (See Dietz Dep. Tr. at 60-65; Reutiman Dep. Tr. at 69-75; Bailey Dep. Tr. Ex. 9.)

On October 8, 2002, Bailey presented Reutiman with a written complaint, which consisted of handwritten notes recounting verbal exchanges between Dietz and Bailey where she felt she was being unfairly blamed for mistakes. (See Bailey Dep. Tr. at 147-50, Ex. 8.) Bailey gave Reutiman the names of four potential witnesses and Reutiman conducted an investigation of the claims. (See Reutiman Dep. Tr. at 51-56.) Bailey asserts Reutiman's "investigation was perfunctory because [Dietz] had already decided to terminate her." (Mem. in Opp'n at 8 (citing Dietz Dep. Tr. at 80).)

### C. Bailey's Employment Is Terminated

On October 11, 2002, Bailey was given, and signed, the written warning, the PIP, and the updated performance appraisal, which rated her overall performance as "nearly meets requirements." (See Bailey Dep. Tr. Ex. 9.) While issuing an updated performance appraisal was a departure from Seagate's regular policy in which employees were given an appraisal once a year, Reutiman recommended that Dietz give the new appraisal "[b]ecause the performance hadn't improved and you need to have an up-to-date performance appraisal based on the performance improvement plan." (Reutiman Dep. Tr. at 96.) The updated documentation identified performance deficiencies in Bailey's work quality and cooperation, set out expectations for improved performance, and provided thirty days for improvement. (See Bailey Dep. Tr. Ex. 9.)

Bailey understood her obligations under the PIP, but felt it was "unfair and biased" and "setting [her] up for failure." (Bailey Dep. Tr. at 131.) Afterwards, Dietz met with her weekly and "somewhat" offered to help improve her performance. (Id. at 132-34.)

8

Bailey felt that Dietz was "demeaning" by "pointing out one error one day and then the following week, all of a sudden, there was another type of error . . . it was more focused that it had to have been my error." (Id. at 134-35.) Bailey felt that someone else could have easily caused the errors, and that she met the goals and objectives of the PIP. (Id.)

After issuing the written warning to Bailey, Dietz concluded that Bailey had not met the requirements of the PIP. (See Dietz Dep. Tr. at 68-69.) On November 22, 2002, Dietz presented Bailey with a final warning. (See id. at 69; Bailey Dep. Tr. Ex. 9.) The final warning contained similar documentation of deficient performance as the first warning, and included a second PIP. (See Bailey Dep. Tr. at 137, Ex. 9.) Bailey understood the goals and objectives of the second PIP, made an effort to meet those goals, and met with Dietz regarding the PIP. (See id. at 137-38.) At those meetings, Bailey felt Dietz was talking down to her by telling her she was a "basic" secretary and failing to realize that she was showing progress in different areas. (See id. at 137-39.) In the end, Dietz determined that Bailey had not met the required improvements expressed in the final warning. (See Dietz Dep. Tr. at 84.) On December 10, 2002, he notified Bailey that her employment was terminated. (Id.) After Bailey left, the remaining secretaries, each of whom was female, absorbed her duties. (Dietz Aff. ¶ 9.)

**D.   Litigation**

In March 2004, Bailey sued Seagate in Minnesota state court alleging gender discrimination and reprisal discrimination in violation of the Minnesota Human Rights

Act ("MHRA"). (Compl. ¶¶ 28-38.) Seagate removed the case to this Court and its Motion for Summary Judgment followed.

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## Analysis

### A.   "Gender Harassment"

Bailey alleges that she was subjected to "gender harassment" in violation of the MHRA. (See Mem. in Opp'n at 1, 25.) The MHRA provides that it is an unfair

employment practice "for an employer, because of . . . sex . . . to . . . discriminate against a person with respect to hiring, tenure, compensation, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2.  Discrimination based on sex includes "sexual harassment."  Id. § 363A.03, subd 13.  "Sexual harassment"

> includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when: . . .
>
> (3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment.

Id. § 363A.03, subd. 43.

To constitute actionable sexual harassment under the MHRA, the "conduct must be unwelcome, it must consist of 'sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature,' and it must be sufficiently pervasive so as to substantially interfere with the plaintiff's employment or to create a hostile, intimidating or offensive work environment."  Cummings v. Koehnen, 568 N.W.2d 418, 424 (Minn. 1997) (citations omitted); see Donnelly v. Indep. Sch. Dist. 199, 2004 WL 1774734, at *1-2 (Minn. Ct. App. Aug. 10, 2004).  This is a "high threshold."  Cummings, 568 N.W.2d at 424.

Under any reasonable reading of the record, Bailey has failed to establish that Dietz's conduct violated the MHRA as interpreted by Cummings and its progeny.  At most, Bailey has shown that she was subjected to persistent work performance criticism. There is no evidence of any sexual advances, requests for sexual favors, sexually

motivated physical contact, or other verbal or physical conduct or communication of a sexual nature. In fact, the only reference to sex is Bailey's own self-description of being a "strong-minded woman."

Bailey cites one case—Palesch v. Missouri Comm'n On Human Rights, 233 F.3d 560 (8th Cir. 2000)—in support of her claim. (See Mem. in Opp'n at 25-26.) However, that case involved a Title VII claim, which "is not similar to" the MHRA "in its treatment of sexual harassment." Cummings, 568 N.W.2d at 422 n.5 (noting that the MHRA's "statutory language includes the specific definition of sexual harassment"). In addition, Palesch determined that the plaintiff's evidence was insufficient to establish a hostile work environment claim under Title VII. See Palesch, 233 F.3d at 566-68. Soundly rejecting the plaintiff's claim, the Eighth Circuit observed:

> The actions complained of by Palesch . . . appear to be nothing more than an effort to impose a code of workplace civility. The complained of conduct simply does not rise to the level of hostile work environment prohibited by Title VII. While it appears that Palesch had personality conflicts with numerous co-workers, this is insufficient to satisfy the threshold level of evidence to go forward with her case. . . . Palesch offers little more than speculation and conjecture to make the required connection from the mistreatment she alleges to a gender . . . based animus.

Palesch, 233 F.3d at 567-68. This observation is equally applicable to this case. Accordingly, the Court will grant Seagate's Motion and dismiss Bailey's harassment claim.

**B.    Reprisal**

Bailey also alleges that she suffered reprisals for allegedly complaining about "gender harassment." (See Mem. in Opp'n at 10-24.) Under the MHRA, it is an unfair practice for anyone who participated in alleged discrimination as a perpetrator, employer or agent thereof to "intentionally engage in any reprisal against any person because that person . . . opposed a practice forbidden" by the MHRA. Minn. Stat. § 363A.15. A "reprisal" includes "any form of intimidation, retaliation, or harassment," and it is a reprisal for an employer to "depart from any customary employment practice" or to "transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status." Id.

The three-part McDonnell Douglas test applies to reprisal claims. Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999). Under McDonnell Douglas, Bailey must first establish a prima facie case of reprisal. See id. at 101-02. If she demonstrates a prima facie case, then the burden shifts to Seagate to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. at 102. If Seagate articulates such a reason, then Bailey must demonstrate that the stated reason is pretextual. Id.

        **1.**     **Prima Facie Case**

To establish a prima facie case of reprisal discrimination, Bailey must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. Fletcher, 589 N.W.2d at 101-02. Seagate

contends that Bailey did not engage in statutorily protected activity, did not suffer an adverse employment action beyond her termination, and has not established a causal connection. (See Mem. in Supp. at 20-21, 23-27.) For present purposes, the Court will assume that Bailey has made out a prima facie case.[9] However, this assumption only goes so far when it comes to the second element: only Bailey's replacement performance review and termination will be considered adverse employment actions.[10] See Spears v. Missouri Dep't of Corrections & Human Resources, 210 F.3d 850, 853-54 (8th Cir. 2000) (stating that adverse employment actions include termination and unfavorable evaluations used to detrimentally alter the terms or conditions of employment).

### 2. Legitimate, Nondiscriminatory Reasons

---

[9] Seagate makes a strong argument that Bailey did not engage in MHRA-protected activity. Were it necessary to reach this issue, the Court would agree. To constitute protected activity, Bailey must demonstrate a good faith, reasonable belief that the conduct she complained about violated the MHRA. See Curd v. Hank's Fine Furniture, Inc., 272 F.3d 1039, 1041-42 (8th Cir. 2001); Buettner v. Arch Coal Sales Co., 216 F.3d 707, 714 (8th Cir. 2000). Under the circumstances of this case, the Court would find that no reasonable person could conclude that Dietz's persistent criticisms violated the MHRA. See Cummings, 568 N.W.2d at 424.

[10] Bailey advances a wide-range of alleged adverse employment actions in which she was (1) not wanted on Dietz's team and Dietz "took steps to pad the file to accomplish that goal of terminating her"; (2) subjected to "regular harassment and unjustified criticism on an almost daily basis"; (3) given a replacement performance evaluation; (4) issued "numerous, unjustified warnings and placed . . . on a PIP"; (5) treated like the "black sheep"; (6) given different job duties and responsibilities; (7) denied her request for "schooling"; and (8) terminated on December 10, 2002. (See Mem. in Opp'n at 15-16.) With the exception of the replacement performance evaluation and her termination, Bailey's workplace grievances do not rise to the level of adverse employment actions. See Sallis v. Univ. of Minnesota, 322 F. Supp. 2d 999, 1007 (D. Minn. 2004) (and cases cited therein), aff'd, 408 F.3d 470 (8th Cir. 2005).

Assuming that Bailey has made out a prima facie case, the burden shifts to Seagate to articulate a legitimate, nondiscriminatory reason for her replacement performance review and termination. Seagate contends that both the review and the termination were the result of deficient performance and, at worst, a personality conflict with Dietz. (See Mem. in Supp. at 1, 9-13, 30-31.) Deficient performance and personality conflicts are legitimate, nondiscriminatory reasons for adverse employment actions. See, e.g., Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1047 (8th Cir. 2003) (finding poor performance as a legitimate, nondiscriminatory basis for an adverse employment action); Edmund v. Midamerican Energy Co., 299 F.3d 679, 685-86 (8th Cir. 2002) ("Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices.").

### 3. Pretext

Having articulated legitimate, nondiscriminatory reasons for its actions, the burden shifts to Bailey to demonstrate that those reasons are pretextual. See Fletcher, 589 N.W.2d at 102. Upon consideration of Bailey's assertion of pretext, the Court finds that she has failed to offer sufficient evidence to allow a reasonable fact-finder to conclude that her sex, rather than her poor performance or personal conflicts with Dietz, motivated Seagate's decision to terminate her. See Vaughn v. Roadway Express, Inc., 164 F.3d 1087, 1090 (8th Cir. 1998).

Bailey argues that Seagate's asserted reasons for its actions are not believable because Dietz decided to terminate her in the summer of 2002, while her performance

evaluation at that time rated her overall performance as "exceeds expectations." (See Mem. in Opp'n at 21-22.) Bailey overstates her performance review. While her overall performance did exceed expectations, her evaluation also identified less satisfactory performance in certain areas. (See Bailey Dep. Tr. Ex. 2.) For example, with respect to the quality of her work, the evaluation rates her as "nearly meets requirements" and notes that "there is a need for complete accuracy when preparing supporting documents for patent prosecution; the need and the goal to increase accuracy has previously been discussed with [Bailey]." (Id.) In addition, with respect to work organization and planning, the evaluation rates her as "nearly meets requirements" and notes that "fundamental to patent prosecution is timeliness; as [Bailey] becomes more organized and prioritizes her tasks appropriately she should be able to be" working ahead of schedule. (Id.) Similar deficiencies were also noted in Dietz's records at the time. (See Dietz Aff. Ex. A.) Thus, even if Dietz allegedly decided to terminate Bailey during the summer of 2002, Bailey's performance was not viewed as entirely satisfactory at that time.

When an employer articulates reasons for its actions not forbidden by law, it is not the Court's province to decide whether those reasons were wise, fair, or even correct, so long as they truly were the reasons for its actions. See Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998). Seagate's reasons for its actions are that Bailey performed poorly and had a personal conflict with Dietz. Nothing in the record establishes that these were not its true reasons. Moreover, the key question is not whether Bailey truly had a conflict or made mistakes, "but whether the employer really believed" she did. Hitt v.

Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004) (emphasis in original) (citation omitted); see Pope v. ESA Servs., Inc., 406 F.3d 1001, 1008 (8th Cir. 2005).  There is no evidence that Dietz did not believe Bailey had a conflict or committed errors.  In fact, Bailey does not deny a conflict, nor does she deny making mistakes, but she attributes them to overwork and unreasonable expectations.  (See Bailey Aff. ¶ 4.)  While Bailey states that "any minor errors that occurred . . . were certainly understandable based on the dramatic changes and growth ongoing in the IP department, the excessive workload problems, and the hiring of new employees, who needed training" (Mem. in Opp'n at 20), any argument that the mistakes were not serious enough merely questions the soundness of Seagate's judgment and does not demonstrate pretext.  See Wilking, 153 F.3d at 874.

As has been stated many times, the federal courts do not judge the wisdom or fairness of business judgments made by employers; rather, the "inquiry is limited to whether the employer gave an honest explanation of its behavior."  Wilking, 153 F.3d at 873 (citing Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 973 (8th Cir. 1994)); see Vaughn, 164 F.3d at 1091.  In sum, there is no evidence, beyond Bailey's speculation, that her review and termination was the product of intentional discrimination.  See Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003) (stating more than "speculation, conjecture, or fantasy" must be offered to withstand summary judgment).

Accordingly, the Court will grant Seagate's Motion and will dismiss Bailey's reprisal claim.[11]

---

[11] To the extent Bailey alleges a disparate treatment claim in her Complaint, it fails for several reasons: She has not responded to Seagate's Motion with respect to that claim; she has not provided any evidence of a similarly situated male who was treated differently; and, for the reasons expressed above, she has not shown Seagate's reasons for its actions to be pretextual.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Seagate's Motion for Summary Judgment (Doc. No. 7) is **GRANTED** and Bailey's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: August 5, 2005                                s/ Richard H. Kyle
                                                     RICHARD H. KYLE
                                                     United States District Judge